UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------- X

BARB HILLS,                                              : Case No.:  _____
                                                         :
            Plaintiff,                                   : **COMPLAINT**
                                                         :
       -against-                                         : **DEMAND FOR JURY TRIAL**
                                                         :
SEMGROUP CORPORATION, CARLIN G.                          :
CONNER, THOMAS R. McDANIEL, KARL                         :
F. KURZ, RONALD A. BALLSCHMIEDE,                         :
JAMES H. LYTAL, SARAH M. BARPOULIS,                      :
and WILLIAM J. McADAM,                                   :
                                                         :
            Defendants.                                  :

---------------------------------------- X

    Plaintiff, Barb Hills, by her undersigned attorneys, for this complaint against Defendants,

alleges upon personal knowledge with respect to herself, and upon information and belief based

upon, *inter alia*, the investigation of counsel, as to all other allegations herein, as follows:

## NATURE OF THE ACTION

    1.     This is an action brought by Plaintiff against SemGroup Corporation ("SemGroup"

or the "Company")  and the members of the Company's board of directors (collectively referred

to as the "Board" or the "Individual Defendants" and, together with the Company, the

"Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of

1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a) respectively, and United States Securities and

Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9.  Plaintiff's claims arise in

connection with the proposed acquisition of Semgroup by Energy Transfer, LP ("Energy

Transfer").

    2.     On September 15, 2019, SemGroup entered into an agreement and plan of merger

(the "Merger Agreement"), pursuant to which Energy Transfer's wholly owned subsidiary,

1

Nautilus Merger Sub LLC, ("Merger Sub"), will merge with and into SemGroup, with SemGroup continuing as the surviving corporation and a direct wholly owned subsidiary of Energy Transfer (the "Proposed Transaction").

3.     Under the terms of the Proposed Transaction, each share of SemGroup common stock will be converted into the right to receive a combination of (i) $6.80 in cash and (ii) 0.7275 (the "exchange ratio") of a common unit representing a limited partner interest in Energy Transfer (the "Merger Consideration").

4.     On October 30, 2019, in order to convince SemGroup's public common shareholders to vote in favor of the Proposed Transaction, the Defendants authorized the filing of a materially incomplete and misleading definitive proxy statement (the "Proxy") with the SEC, in violation of Sections 14(a) and 20(a) of the Exchange Act.

5.     In particular, the Proxy contains materially incomplete and misleading information concerning (i) the background of the Proposed Transaction, (ii) financial projections for SemGroup, Energy Transfer, and the combined company, and (iii) the valuation analyses performed by SemGroup's financial advisors, Jefferies LLC ("Jefferies") regarding the Proposed Transaction.

6.     The special meeting of SemGroup shareholders to vote on the Proposed Transaction will be held on December 4, 2019 (the "Shareholder Vote").  It is imperative that the material information that has been omitted from the Proxy is disclosed prior to the Shareholder Vote, so Plaintiff can properly exercise her corporate voting rights.

7.     For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9. Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed

Transaction unless and until the material information discussed below is disclosed to SemGroup's public common shareholders sufficiently in advance of the upcoming Shareholder Vote or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

9.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under the traditional notions of fair play and substantial justice.  "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state."  *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985).  "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court."  *Id.* at 1316.

10.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District.  Indeed, SemGroup's common stock trades on the New York Stock Exchange ("NYSE"), which is headquartered in this District and SemGroup hired Jefferies to serve as its financial advisor and D.F. King & Co., Inc. to serve as its proxy solicitor in connection with

the Proposed Transaction, both of which are also located in this District.  *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases).

## PARTIES

11.     Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of SemGroup common stock.

12.     Defendant SemGroup is a public company incorporated under the laws of Delaware engaged in diversified services for the North American fossil fuel industry.  SemGroup has its principal executive offices located at Two Warren Place, 6120 South Yale Avenue, Suite 1500, Tulsa, Oklahoma 74136.   SemGroup common stock is traded on the New York Stock Exchange ("NYSE") under the ticker symbol "SEMG."

13.     Individual Defendant Carlin G. Conner ("Conner") is, and has been at all relevant times, the Company's President and Chief Executive Officer and a director of the Company.

14.     Individual Defendant Thomas R. McDaniel ("McDaniel") is, and has been at all relevant times, the Chairman of the Company's Board of Directors.

15.     Individual Defendant Karl F. Kurz ("Kurz") is, and has been at all relevant times, a director of the Company.

16.     Individual Defendant Ronald A. Ballschmiede ("Ballschmiede"), is and has been at all relevant times, a director of the Company.

17.     Individual Defendant James H. Lytal ("Lytal") is, and has been at all relevant times, a director of the Company.

18.     Individual Defendant Sarah M. Barpoulis ("Barpoulis") is, and has been at all relevant times, a director of the Company.

19.     Individual Defendant William J. McAdam ("McAdam") is, and has been at all

relevant times, a director of the Company.

20.     The Defendants identified in paragraphs 13 through 19 are collectively referred to herein as the "Board" or the "Individual Defendants," and together with the Company, the "Defendants."

## SUBSTANTIVE ALLEGATIONS

**Background of the Company**

21.     SemGroup is engaged in diversified services in the North American fossil fuel industry, with operations including the gathering, transportation, storage, distribution, marketing and other mainstream services, which are provided primarily to producers, refiners of petroleum products and other market participants located in the Gulf Coast, Midwest and Rocky Mountain regions of the United States and Canada.  SemGroup's operations are conducted directly and indirectly through its primary operating segments: U.S. Liquids, U.S. Gas, and Canada.

22.     SemGroup has grown considerably during the past few years and is well-positioned for continued growth.  For example, SemGroup recently acquired Houston Fuel Oil Terminal Company ("HFOTCO"), which operates one of the largest oil terminals in the U.S. in the Houston Ship Channel on the Gulf Coast, in 2017.

23.     In light of its recent financial performance, SemGroup had exceptional long-term prospects prior to the announcement of the Proposed Transaction.  As the Company announced in its August 8, 2019 Press Release entitled *SemGroup Reports Second Quarter 2019 Financial Results*:

> "Second quarter results were in line with expectations," said SemGroup President and Chief Executive Officer Carlin Conner. "Investments over the past year in our U.S. Liquids and Canadian segments drove the increased year-over-year Adjusted EBITDA. ***This growth highlights the value of strategic projects like the Houston terminal expansion and the Wapiti and Patterson Creek gas plants, which will provide long-term, stable cash flows.***"

"I'm pleased to see our strategy deliver the intended financial and commercial results," said Conner. "***Our well-positioned assets in Canada, the Mid-Continent and Gulf Coast are anchored by contracted cash flows that provide us confidence in our future growth.*** While our assets are performing, we have additional work to do on our balance sheet and are evaluating alternatives to de-lever while creating shareholder value."

24.     Thus, the Proposed Transaction comes at a time when SemGroup's recent and future success was not fully reflected by its share price.  The Proposed Transaction will "compensate" SemGroup shareholders with Merger Consideration that fails to adequately compensate them for the intrinsic value of their shares.

25.     Despite SemGroup's intrinsic value and growth prospects, the Individual Defendants are agreeing to a merger that deprives SemGroup's public shareholders of the ability to partake in the Company's individual growth and instead dilutes the value of their SemGroup stock with an inadequate mix of cash and less intrinsically valuable ownership interest in Energy Transfer. It is therefore imperative that shareholders receive the material information (discussed in detail below) that Defendants have omitted from the Proxy, which is necessary for shareholders to properly exercise their corporate suffrage rights and cast an informed vote on the Proposed Transaction.

**Background and the Announcement of the Proposed Transaction**

26.     At least as early as March 2019, SemGroup was engaging with Company A, a large North American oil and gas infrastructure company, in discussions regarding a newly formed joint venture (the "Proposed Joint Venture") that contemplated the contribution of SemGroup of most of its crude oil related assets, including the HFOTCO assets in exchange for ownership in the Proposed Joint Venture and cash.

27.     On July 12, 2019, Energy Transfer made an unsolicited acquisition proposal to

acquire SemGroup for $15.56 per share of SemGroup common stock.  Proxy, 34.

28.     On August 20, 2019, Company A revised the terms of its proposal by reducing the implied value of SemGroup's assets and modifying the structure of the Proposed Joint Venture. Proxy, 35.  The Proxy does not disclose the original implied valuation of SemGroup's assets and does not disclose the valuation implied by the proposal for the Proposed Joint Venture as revised by Company A on August 20, 2019.

29.     On August 22, 2019, Company C, a private equity firm, "reported that Company C had met with a shareholder of SemGroup," and proposed to Conner that Company C "would be willing to acquire SemGroup in a take-private transaction for an indicative value of $16.50 per share of SemGroup common stock, subject to confirmation from Company C's investment committee."  Proxy, 35.

30.     On August 23, 2019, Energy Transfer revised its acquisition proposal to increase its implied valuation from $16.50 per share of SemGroup common stock to $17.00 per share of SemGroup common stock, and further proposed that "SemGroup would enter into a confidentiality agreement to commence sharing certain commercial and legal information."  Proxy, 36. SemGroup and Energy Transfer entered a confidentiality agreement later that day.  *Id.*  On August 25, 2019, SemGroup entered a confidentiality agreement with Company C.  *Id.*  Each confidentiality agreement included a standstill provision with a "Don't Ask, Don't Waive" provision that was subject to a "customary "fall away" provision, which provided that the restrictions in the "standstill" would terminate if, among other things, SemGroup entered into a business combination agreement" to be acquired by some other counterparty.  *Id.*

31.     On August 26, 2019, Energy Transfer clarified that its proposal to acquire SemGroup for $17.00 per share of SemGroup common stock would consist of 60% equity and

40% cash, with the equity component reflecting an exchange ratio of 0.7275 Energy Transfer common units per shre of SemGroup common stock, and (ii) the assumed redemption of SemGroup preferred stock at 101% of the liquidation preference.  Proxy, 36.

32.    On August 27, 2019, the Board instructed Jefferies "to proceed with a market check process in order to seek additional indications of value for SemGroup from other counterparties." Proxy, 36.   Jefferies contacted "a group of strategic and financial counterparties," including Company D, Company E, Company F, Company G, and Company H.  *Id.*

33.    On September 3, 2019, members of SemGroup's executive management team, financial advisors, and outside counsel met with members of Energy Transfer's executive management team, financial advisors, and outside counsel "to discuss commercial and financial due diligence matters."  Proxy, 37.  On September 4, 2019, Energy Transfer's outside counsel sent a draft of the merger agreement to SemGroup's outside counsel.

34.    On September 15, 2019, the Board unanimously resolved to approve the Proposed Transaction.  Proxy, 39-40.  Prior to the opening of U.S. stock markets on September 16, 2019, SemGroup issued a press release to announce the Proposed Transaction:

> *SemGroup to be Acquired by Energy Transfer in $5 Billion Transaction*
>
> *SemGroup to merge with one of the largest, diversified midstream energy companies in North America*
>
> *Benefits of scale will strengthen and accelerate growth opportunities for SemGroup assets and improve access to capital markets*
>
> *SemGroup shareholders to benefit from significant, immediate premium and future upside of combined company*
>
> Tulsa, Okla. – September 16, 2019 – SemGroup® Corporation (NYSE: SEMG) today announced it has entered into a definitive merger agreement whereby SemGroup will be acquired by Energy Transfer LP (NYSE: ET) ("ET" or "Energy Transfer") in a unit and cash transaction valued at approximately $5.1 billion, including the assumption of debt and other liabilities.

Under the terms of the agreement, which has been unanimously approved by the Boards of Directors of both companies, SemGroup shareholders will receive $6.80 per share in cash and 0.7275 of an ET common unit for each SemGroup share, or approximately 40% cash and 60% equity. The equity consideration received is expected to be treated as a tax-free transaction. The transaction values SemGroup at $17.00 per share, and represents a 65% premium to SemGroup's closing share price of $10.28 on September 13, 2019, and an 87% premium to SemGroup's 20 day volume weighted average price (VWAP) as of the same date. Upon closing, SemGroup shareholders are expected to own approximately 2.2% of ET's outstanding common units.

SemGroup Chief Executive Officer, Carlin Conner, said, "This strategically and financially compelling combination will result in SemGroup joining one of the largest midstream energy companies in the country, with a strong footprint in all major U.S. production basins. The combined entity's size, scale and financial profile will ensure that SemGroup's assets, including our Gulf Coast terminal, mid-continent footprint and our Canadian joint venture SemCAMS Midstream, benefit from significant growth well into the future. We look forward to leveraging the increased pipeline connectivity and expanded terminalling infrastructure that the combined entity provides."

Conner continued, "SemGroup has been exploring a range of strategic alternatives aimed at increasing shareholder value, and determined that this combination with ET is in the best interests of shareholders -- providing immediate value, a significant premium, and opportunity to participate in the future upside of the combined business. Our transaction with ET underscores the strength of SemGroup's assets, and is a testament to our employees' dedication, hard work and focus on providing safe, efficient and reliable service while creating an asset portfolio that is highly desired."

The transaction is expected to close by late 2019 or early 2020, subject to obtaining regulatory approvals, SemGroup shareholder approval and other customary closing conditions.

**The Preclusive Deal Protection Devices**

35.     To the detriment of the Company's public shareholders, the Individual Defendants agreed, in the Merger Agreement, to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and all but ensure that the Proposed Transaction is consummated and that no competing offers emerge for the Company.

36.     Section 5.4 of the Merger Agreement ("Non-Solicitation; Acquisition Proposals;

9

Change in Recommendation") is a restrictive "no-shop" provision that prohibits the members of the Board from soliciting proposals relating to alternative offers or business combinations.

37.     Section 5.4(a) of the Merger Agreement strictly prohibits, except under extremely limited circumstances, the Individual Defendants from engaging in discussions or negotiations relating to proposals regarding alternative acquisitions or business combinations

38.     Sections 5.4(b) of the Merger Agreement requires the Board to provide Energy Transfer with written notice of any Acquisition Proposal within twenty-four (24) hours of its receipt.  Sections 5.4(d), (e), and (f) likewise require the Board to provide prior written notice of its intention to terminate the Merger Agreement in favor of any Superior Offer and negotiate with Energy Transfer following Energy Transfer's receipt of the notice, so that Energy Transfer has the opportunity to adjust the terms and conditions of the Merger Agreement so that the Acquisition Proposal ceases to be a Superior Offer.

39.     In addition, the Merger Agreement provides that the Company will be required to pay to Energy Transfer a termination fee of $54,500,000.00 with respect to any termination under the No-Shop provisions of the Merger Agreement or reimburse Energy Transfer's documented out-of-pocket expenses up to $27,250,000.00 "in circumstances otherwise where the breakup fee is not payable."

40.     Ultimately, these preclusive deal protection devices restrained and continue to restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company, and further restrain the Company's public shareholders' ability to disapprove the Proposed Transaction.

41.     Indeed, the Proposed Transaction was negotiated through a flawed and conflicted sales process pursuant to which SemGroup did not even consider reaching out to potential

counterparties until after it had already secured a proposal that it was prepared to accept from Energy Transfer.

42.     The aggregate effect of the preclusive deal protection devices, viewed in light of the materially inadequate consideration offered for the Company's shares in the Proposed Transaction and the flawed and conflicted sales process pursuant to which the Proposed Transaction was negotiated, supports an inference that the Board was not acting in good faith in approving the terms of the Merger Agreement.

43.     Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that the Company's shareholders will continue to suffer absent judicial intervention.

**The Proxy Omits Material Information**

44.     On October 30, 2019, Defendants filed the materially incomplete and misleading Proxy with the SEC.  The Individual Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.  However, the Proxy misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision in connection with the Proposed Merger.

45.     Specifically, the Proxy omits three types of material information: (i) information regarding the background of the transaction and the Individual Defendants' potential conflicts of interest, and (ii) critical financial information for SemGroup, Energy Transfer, and the combined company; and (iii) key inputs and assumption underlying Jefferies' valuation analyses.

A.     The Proxy Omits Material Information Regarding the Background of the Transaction

46.     The Proxy fails to disclose any of the final terms of the Proposed Joint Venture with

Company A other than disclosing that the final terms of the Proposed Joint Venture contemplated "the contribution by SemGroup of most of its crude oil related assets, including the Houston Fuel Oil Terminal Company assets, in exchange for 50% ownership in a newly formed joint venture and cash." *See,* Proxy, 38. Without knowing the Proposed Joint Venture original or revised proposals' terms--including the proposals' implied valuation of the Proposed Joint Venture itself, the implied valuation of SemGroup's assets contributed, or the amount of cash consideration that SemGroup was to receive--it is impossible for the Company's public common shareholders to know whether the Proposed Transaction is actually preferable for the Company's public common shareholders relative to the Proposed Joint Venture with Company A. The details of the Proposed Joint Venture are especially material to the Company's public shareholders because the Proposed Transaction entitles the Company's insiders to substantial change-of-control benefits that they would not be entitled to absent a change in control of the Company.

47. The Proxy fails to disclose whether the Company considered the possibility of reaching out to potential counterparties prior to the August 27, 2019 outreach, which was made after the Company had already negotiated an acceptable proposal with Energy Transfer. This information is material to shareholders considering how to vote on the Proposed Transaction because the outreach does not appear to have been calculated to induce competitive counterproposals.

48. The Proxy states that "Jefferies and members of the deal team," had "de minimis conflicts" that the Board "determined to be immaterial both individually and in the aggregate," Proxy at 39, but fails to *actually* disclose those conflicts of interest to the Company's public shareholders. Without knowing the *actual* conflicts that were disclosed to the Board on September 13, 2019---after the Company and Jefferies had long had the opportunity to steer the transaction

towards Energy Transfer---the Company's public shareholders cannot determine for themselves whether or not these conflicts were, in fact, de minimis and immaterial.

B.    The Proxy Omits Critical Financial Information for SemGroup, Energy Transfer, and the Combined Company

49.    First, the Proxy fails to disclose any financial projections or valuation information for Energy Transfer or any of the synergies projected for the combined company. This financial information is very important to SemGroup shareholders given the Energy Transfer equity portion of the Merger Consideration. In order to cast an informed vote on the Proposed Transaction, SemGroup shareholders require two critical pieces of information: (i) the value of the Company they are receiving units of, Energy Transfer; and (ii) the value of the combined company, including synergies.

50.    The Proxy clearly conveys that the management of Energy Transfer provided financial projections to Jefferies, reviewed and discussed such financial projections with Jefferies, and confirmed the financial projections as appropriate for use in Jefferies' analyses and a reasonable basis upon which to evaluate Energy Transfer.[1] Further, Jefferies utilized these financial projections in performing their valuation analyses, including their *Discounted Cash Flow Analysis* and *Selected Public Companies Analysis*. However, no financial projections for Energy Transfer are disclosed anywhere in the Proxy. Accordingly, the omission of these projections renders the descriptions and summaries provided in the Proxy misleadingly incomplete.

51.    Moreover, in disclosing the "material factors" considered by the Board in recommending SemGroup shareholders vote in favor of the Proposed Transaction, the Proxy touts the opportunity for SemGroup shareholders to participate in the future earnings and growth of

---

[1]    Defendants concede that information "made available to the SemGroup board of directors and SemGroup's financial advisor in connection with the merger" should be disclosed to SemGroup shareholders. Proxy at 54.

Energy Transfer and the synergies and strategic considerations of the combined company.  Yet, like the Energy Transfer financial projections, the synergies and cost savings projected as a result of the Proposed Transaction are withheld from SemGroup shareholders. Recommending that SemGroup shareholders vote in favor of the Proposed Transaction on the basis of the value of the combined company without providing the financial information of the acquiring company or synergy values used to make that determination renders such statements misleading. Perhaps nothing is more relevant for making a merger decision than the earnings picture of the acquiring company, at least to a shareholder of the company being acquired. Accordingly, Defendants must disclose the financial projections for Energy Transfer and the information related to the synergies of the Proposed Transaction, so that SemGroup shareholders may understand the decision they are being asked to make

52.     Second, to perform their *Discounted Cash Flow Analysis*, Jefferies utilized cash flows from calendar years 2020-2024 as provided by managements of both SemGroup and Energy Transfer. However, the Proxy only discloses financial projections for SemGroup for the years 2019-2022. The omission of the years 2023 and 2024 SemGroup projections—along with the Entirety of the Energy Transfer projections—renders the both the summary of this analysis and the summary of the projections provided in the Proxy misleadingly incomplete.

53.     Third, the Proxy omits critical financial projections, including the net income projections for SemGroup, Engergy Transfer, or the combined company (the "Net Income Projections"). Defendants elected to summarize the projections for SemGroup in the Proxy, but they excised and failed to disclose the Net Income Projections. By providing this limited summary in the Proxy and withholding the Net Income Projections, Defendants render the table of projections on page 54 of the Proxy materially incomplete and provide a misleading valuation

picture of SemGroup.  Simply put, net income projections are irreplaceable when it comes to fully, fairly, and properly understanding a company's projections and value.

54.     Unlike poker where a player must conceal his unexposed cards, the object of a proxy statement is to put all one's cards on the table face-up. In this case only some of the cards were exposed—the others were concealed. If a proxy statement discloses financial projections and valuation information, such projections must be complete and accurate.  The question here is not the duty to speak, but liability for not having spoken enough.  With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths. Accordingly, Defendants have disclosed some of the projections relied upon by Jefferies and the Board but have omitted the Energy Transfer projections, the synergy information, the 2023-2024 SemGroup projections, and the Net Income projections. These omissions render the projections, the summary of the Jefferies' valuation analyses, and the summary of the Board's *Reasons for the Merger* included in the Proxy misleadingly incomplete.

C.     The Proxy Omits Material Information Underlying Jefferies' Valuation Analyses

55.     The Proxy describes Jefferies' fairness opinion and the various valuation analyses performed in support of their opinion.  Defendants concede the materiality of this information in citing Jefferies' fairness opinion and their valuation analyses among the "material factors" the Board considered in making its recommendation to SemGroup shareholders. Proxy at 42-43; *see also* Proxy at 47 ("The following is a summary of the material financial and comparative analyses performed by Jefferies in connection with Jefferies' delivery of its opinion and that was presented to the SemGroup board of directors on September 15, 2019."). However, the summary of Jefferies' fairness opinion and analyses provided in the Proxy fails to include key inputs and assumptions

underlying the analyses. Without this information, as described below, SemGroup's shareholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on Jefferies' fairness opinion in casting a vote on the Proposed Transaction. This omitted information, if disclosed, would significantly alter the total mix of information available to SemGroup's shareholders.

56. With respect to Jefferies' *Selected Public Companies Analysis* beginning on Page 48, the Proxy fails to disclose the enterprise values and individual benchmarks and multiples for each of the companies selected. In fact, the Proxy affirmatively states that "a significantly larger or smaller company with substantially similar lines of business and business focus may have been included" but it is impossible for the Company's public shareholders to know which of the selected companies were "significantly larger or smaller" than SemGroup or Energy Transfer, respectively, and thus makes it impossible for the Company's public shareholders to determine how much the selected companies that were "significantly larger or smaller" than SemGroup or Energy Transfer, respectively, affected the analysis. Indeed, this information is unquestionably material to shareholders trying to decide how much weight, if any, to place on the *Selected Public Companies Analysis* because courts have roundly rejected comparable companies analyses as wholly uninstructive when they presume that company size is not itself a factor in the valuation of oil-and-gas companies like SemGroup. *See, e.g., Rosenblatt v. Getty Oil Co.*, Case No. 5278, 1983 Del. Ch. LEXIS 570, at *71-72 (Del. Ch. Sept. 19, 1983) (rejecting analysis that used "smaller oil and gas producing companies as opposed to a major integrated company such as [the appraised company]"), *aff'd*, 493 A.2d 929 (Del. 1985); *see also, In re PNB Hldg. Co. S'holder Litig.*, Cons. C.A. No. 28-N, 2006 Del. Ch. LEXIS 158, at *96 n.125 (Del. Ch. Aug. 18, 2006) (rejecting comparable companies analysis where the "comparable publicly-traded companies all were

significantly larger than [the subject company], with one having total assets of $587 million as compared to [the subject company's] assets of $216 million.").

57.    With respect to Jefferies' *Discounted Cash Flow Analysis* beginning on Page 50, the Proxy plainly fails to disclose the *actual cash flows* on which the analysis was.  Further, the Proxy fails to adequately disclose Jefferies' rationale and basis for: (i) selecting a range of terminal yield values of 12.50% and 11.50% with respect to SemGroup and 8.50% and 7.50% with respect to Energy Transfer, and (ii) selecting a range of discount rates of 10.77% and 9.77% with respect to SemGroup and 10.15% and 9.15% with respect to Energy Transfer.  Without knowing the amounts of the projected cash flows themselves or how Jefferies determined the terminal yield values and discount rates that it applied for purposes of its analysis, it is impossible to determine how much weight to place in the *Discounted Cash Flow Analysis*.

58.    With respect to Jefferies' *Selected Transactions Analysis* beginning on Page 51, the Proxy fails to disclose the criteria Jefferies used in deeming the selected transactions "comparable," fails to disclose the implied valuation of each transaction, and fails to disclose whether Jefferies made any attempt to account for "disturbances" to stock price that occurred prior to the announcement of a transaction, for example a "jump" in stock price that occurred because a company announced that it was anticipating a merger before any merger was, in fact, finalized. *See, e.g., In re Columbia Sec. Litig.*, 155 F.R.D. 466, 483 (S.D.N.Y. 1994) ("The fact that Columbia stock jumped 25 percent when Columbia finally announced in September 1989 that it was engaged in acquisition discussions with an unannounced suitor is convincing evidence that whatever 'acquisition expectations' were previously built into Columbia stock before this date were less than fully confident ones.").  All of this information is material to shareholders and presentation of the *Selected Transactions Analysis* without this information renders the Proxy false

and misleading because without knowing whether the selected transactions are actually comparable to the acquisition of SemGroup, it is impossible for SemGroup's public shareholders to know whether the *Selected Transactions Analsyis* actually supports an inference that the Merger Consideration fairly compensates the Company's shareholders for the value of their shares.

59.     If a proxy discloses financial projections and valuation information, such projections and valuations must be complete, accurate, and honest.  The question is not simply whether there is a duty to speak, but also whether there may be liability for not having spoken enough.  With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths.  *See Campbell v. Transgenomic, et al.*, No. 18-2198 (8th Cir., March 1, 2019) (noting that "half-truths" are actionable misrepresentations under securities laws and collecting cases).  Accordingly, Defendants have disclosed some of the information related to the projections, assumptions, and inputs relied upon by Defendants' financial advisors, but have omitted crucial line items, reconciliations, and other information.  Thus, Defendants' omission renders the projections disclosed in the Proxy misleading.

60.     In sum, the omission of the above-referenced information renders the Proxy materially incomplete and misleading, in contravention of the Exchange Act.  Absent disclosure of the foregoing material information prior to the Shareholder Vote, Plaintiff will be unable to cast an informed vote and is thus threatened with irreparable harm warranting the injunctive relief sought herein.

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder)**

61.     Plaintiff incorporates each and every allegation set forth above as if fully set forth

herein.

62.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

63.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

64.     The omission of information from a proxy will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

65.     Defendants have issued the Proxy with the intention of soliciting the Company's common shareholders' support for the Proposed Transaction.  Each of the Individual Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding the valuation analyses performed by Jefferies in support of its fairness opinion.

66.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were

therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to the Company's shareholders although they could have done so without extraordinary effort.

67.     The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy states that Jefferies reviewed and discussed its financial analyses with the Board, and further states that the Board considered the financial analyses provided by Jefferies, as well as its fairness opinion and the assumptions made and matters considered in connection therewith.   Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and the details surrounding the process leading up to the signing of the Merger Agreement.   The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to, separately, review Jefferies' analyses in connection with their receipt of the fairness opinions, question Jefferies as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

68.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy.   The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.   The

Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and preparation and review of the Company's financial projections.

69.     The Company is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

70.     The misrepresentations and omissions in the Proxy are material to Plaintiff, who will be deprived of her right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Shareholder Vote.  Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

71.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

72.     The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of the Company, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and

misleading.

73.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

74.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.   The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were thus directly involved in preparing this document.

75.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Proposed Transaction.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

76.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

77.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

78.     Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.      Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Shareholder Vote or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

B.      Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

C.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

D.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: November 8, 2019            **MONTEVERDE & ASSOCIATES PC**

                                   By: _/s/ Juan E. Monteverde_____
                                       Juan E. Monteverde (JM-8169)
                                       The Empire State Building
                                       350 Fifth Avenue, Suite 4405
                                       New York, NY 10118
                                       Tel:(212) 971-1341
                                       Fax:(212) 202-7880
                                       Email: jmonteverde@monteverdelaw.com

                                       *Attorneys for Plaintiff*