UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED:

MARK TOPLEY,

                Plaintiff,

      v.

SEMGROUP CORPORATION, *et al.*,

                Defendants.

19-CV-9630 (RA)

BARB HILLS,

                Plaintiff,

      v.

SEMGROUP CORPORATION, *et al.*,

                Defendants.

19-CV-10412 (RA)

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

      Plaintiffs Mark Topley and Barb Hills both filed suit against Defendants SemGroup Corporation and members of the SemGroup board of directors Carlin G. Conner, Thomas R. McDaniel, Karl F. Kurz, Ronald A. Ballschmiede, James H. Lytal, Sarah M. Barpoulis, and William J. McAdam. Plaintiffs allege that Defendants omitted material information from a proxy statement filed in connection with a proposed merger. After Defendants made supplemental disclosures regarding the previously omitted information, Plaintiffs dismissed their lawsuits. Plaintiffs now seek attorneys' fees, asserting that their lawsuits substantially benefitted the SemGroup shareholders by enabling them to make an informed vote on the proposed merger. For the reasons provided below, that motion is DENIED.

## BACKGROUND[1]

On September 15, 2019, SemGroup and Energy Transfer LP ("ET") announced a merger whereby ET would acquire SemGroup in a transaction valued at approximately $5 billion (the "Merger"). Compl. ¶ 35.[2] As part of the Merger, SemGroup's shareholders would receive, per share, a combination of (1) $6.80 in cash, without interest, and (2) 0.7275 of a common unit representing a limited partner interest in ET. *Id.* In total, each SemGroup shareholder would receive consideration constituting a 65% premium over the price of SemGroup shares immediately before the Merger's announcement to the public. *Id.*

On October 30, 2019, SemGroup issued and filed a 241-page Proxy Statement with the Securities and Exchange Commission ("SEC") and began distributing it to SemGroup shareholders. Dkt. 14 Ex. 1 (Excerpts of Proxy Statement).[3] The Proxy Statement included, *inter alia*, the following information:

> (i) seven pages of frequently asked questions; (ii) five pages summarizing the considerations taken into account by ET's and SemGroup's directors in evaluating and approving the Merger; (iii) a nine-page summary of Jefferies' (SemGroup's financial advisor) financial analysis of the Merger; (iv) four pages of historical financial statements concerning the parties to the Merger and pro forma per unit information concerning the post-merger entity; (v) a six-page explanation of risk factors associated with the parties and the Merger; (vi) an eight-page description of the events leading up to the Merger; (vii) three pages of SemGroup prospective financial information prepared by SemGroup in connection with its evaluation and approval of the Merger; (ix) a twenty-four page description of the Merger's terms; (x) a copy of the Agreement and Plan of Merger; (xi) a copy of the Support Agreement; and (xii) a copy of Jefferies' fairness opinion.

Def. Mem. at 8 n.10 (citing the full Proxy Statement, *supra* n.3) (internal citations omitted).

---

[1] The Court draws the facts cited in this opinion from the following sources: the complaint in *Topley v. SemGroup Corporation, et al.*, Dkt. 1; the Declaration of Juan Monteverde ("Monteverde Decl."), Dkt. 8; the Declaration of Guri Ademi ("Ademi Decl."), Dkt. 9; and the exhibits filed in conjunction with Defendants' memorandum in opposition, which include SemGroup's Definitive Proxy Statement ("the Proxy Statement"), Dkt. 14 Ex. 1, and SemGroup's Form 8-K ("the Supplemental Disclosures"), Dkt. 14 Ex. 8. The facts presented are undisputed unless otherwise noted.

[2] Unless otherwise specified, all citations to the docket refer to the docket in *Topley v. SemGroup Corporation, et al.*, No. 19-CV-9630.

[3] The full Proxy Statement is publicly available at: https://www.sec.gov/Archives/edgar/data/1489136/000119312519278938/d809887ddefm14a.htm.

Although SemGroup circulated a fairness analysis prepared by its financial advisor Jefferies alongside the Proxy Statement, it did not circulate copies of all of the documents on which Jefferies relied in preparing that opinion, nor did it include all of Jefferies' calculations and analysis. Compl. ¶ 51. As stated above, however, the Proxy Statement did provide a summary detailing Jefferies' work in preparing the opinion, which included "(i) the specific companies and transactions that were analyzed by . . . Jefferies, (ii) the types of multiples calculated for each comparable company and transaction, (iii) that these calculations were performed using publicly available data, (iv) the average and median for each multiple calculated from the selected companies and transactions, and (v) the resulting range of implied prices and exchange ratios for SemGroup stock when applying those multiples." Def. Mem. at 14 n. 13 (citing Dkt. 14 Ex. 1 at 25–28). It also provided Jefferies' discounted cash flow analysis, including the discount rate used in this analysis, as well as a selected public companies analysis. Dkt 14 Ex. 1 at 27. Further, the Proxy Statement included four years of cash flow projections for SemGroup for the years 2019-2022. *Id*. at 31. The Proxy Statement disclosed information about a "de minimis" conflict of interest between Jefferies and ET that "the SemGroup board of directors [had] determined to be immaterial." *Id*. at 18. It also comprised information about the process the SemGroup board used to arrive at the proposed Merger, detailing that "[t]he SemGroup board of directors . . . discussed the appropriate framework for evaluating potential offers from different counterparties, including strategic buyers and private equity firms, as well as the potential value achievable from entering into [a] proposed joint venture transaction with" another company. *Id*. at 15.

On October 18, 2019 and November 8, 2019, respectively, Plaintiffs filed complaints alleging that Defendants' Proxy Statement violated Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 and SEC Rule 14a-9. Dkt. 1 (Topley Complaint); *Hills v. SemGroup Corporation et al*, No. 19-CV-10412 at Dkt. 1 (Hills Complaint). Plaintiffs sought to enjoin SemGroup from holding a shareholder vote until alleged informational deficiencies in the Proxy Statement were corrected,

including the information ultimately released by SemGroup in the Supplemental Disclosures discussed below.  Compl. ¶ 7.  The lawsuits filed by Plaintiffs were two of seven total lawsuits filed against Defendants alleging substantively similar deficiencies in the Proxy Statement.  *See* Dkt. 14 Ex. 2–5, 7.  Two of these lawsuits—which also included demands for disclosure of the information ultimately provided for in the Supplemental Disclosures—were filed on October 15, three days prior to Topley's October 18 lawsuit.  *See id*. Ex. 2 (Thompson Complaint, filed October 15, 2019 in the District of Delaware); *id*. Ex. 3 (Walpole Complaint, filed October 15, 2019 in the District of Delaware).  Another two predated Hills's November 8 lawsuit.  *See id*. Ex. 4 (Lawrence Complaint, filed October 28, 2019 in the District of Delaware); *id*. Ex. 5 (Stallings Complaint, filed October 31, 2019 in the District of Colorado).

On November 27, 2019, Defendants filed with the SEC a Form 8-K disclosing additional information relevant to the Merger ("the Supplemental Disclosures").  Dkt 14 Ex. 8.  In the Supplemental Disclosures, Defendants acknowledged that "seven complaints challenging the sufficiency of the disclosures made in the Proxy Statement/Prospectus… have been filed on behalf of SemGroup stockholders."  *Id*. at 3.  Although they did not "admit[] any liability or wrongdoing," Defendants stated that they were filing the Supplemental Disclosures "to avoid the risk of the Stockholder Actions delaying the Merger and to minimize the expense of defending the Stockholder Actions."  *Id*.  Relevant to the instant litigation, the Supplemental Disclosures contained the following information: (1) the 2019-2022 financial projections for ET; (2) the 2023-2024 financial projections for SemGroup; and (3) discussion of the assumptions and valuation metrics grounding Jefferies' fairness analysis, including (i) individual multiples and premiums Jefferies observed in its Selected Companies and Selected Transactions analyses and (ii) a description of the manner in which Jefferies determined which discount rates to employ in its Discounted Cash Flow analysis.  *Id*. at 4–6.  The Supplemental Disclosures also included explanation of the "de minimis" conflict of interest identified

in the Proxy Statement, acknowledging that Jefferies owned "a de minimis amount of ET common units through a managed account by a representative of Jefferies and that Jefferies held securities of SemGroup and ET in the ordinary course of business for its own account and for the accounts of its customers, which ownership the SemGroup board of directors determined to be immaterial both individually and in the aggregate." *Id*. at 4.  Finally, in the Supplemental Disclosures, SemGroup elaborated on its outreach efforts to potential counterparties, stating that: "[The SemGroup board] considered the value to its stockholders of a sale-of-the-company transaction despite the earlier terminated discussions with other potential buyers and ongoing negotiations with [a third company] in respect of the proposed joint venture transaction" and "instructed representatives of Jefferies to proceed with a formal market check process, including outreach to potential counterparties, in order to seek additional indications of value for SemGroup in response to [ET's] increased, revised unsolicited proposal." *Id*.

Following the Supplemental Disclosures, on December 3 and December 4, respectively, Plaintiffs dismissed their actions as moot.  Dkt. 5; *Hills*, No. 19-CV-10412 at Dkt. 12.  The SemGroup shareholder vote took place on December 4, 2019, and the Merger was approved by a 99.8% vote. Def. Mem. at 1 (citing SemGroup Corp. Form 8-K (publicly available at https://www.sec.gov/Archives/edgar/data/1489136/000119312519307334/d816435d8k.htm)).

Plaintiffs' attorneys billed 131.8 hours litigating the matter—including 56.8 hours spent on recouping attorneys' fees—with fees totaling $75,737.00.  *See* Monteverde Decl. ¶ 9 & Ex. C at 5; Ademi Decl. ¶ 7 & Ex. B at 3.  During January 2020, Plaintiffs negotiated unsuccessfully with Defendants regarding a settlement for attorneys' fees.  *See* Monteverde Decl. ¶ 9 & Ex. C at 3.  Over the next several months, in the aftermath of the unsuccessful negotiations, Plaintiffs prepared to file a motion with the court, *see id*. at 4, and on July 16, 2020, moved for an award of attorneys' fees and expenses in the amount of $400,000.00, *see* Dkt. 6, *Hills*, No. 19-CV-10412 at Dkt. 13.  Plaintiffs

arrived at this final amount by applying a multiplier of 5.25x, which they submit is appropriate due to the "contingent nature…involved in [the] particular case and the quality of [their] work." Pl. Mem. at 21. Defendants filed an opposition to the motion for attorneys' fees on August 19, 2020. Dkt. 14; *Hills*, No. 19-CV-10412 at Dkt. 21.

## DISCUSSION

In the United States, "the general rule [is] that, absent statute or enforceable contract, litigants pay their own attorneys' fees." *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 257 (1975). Courts, however, have carved out exceptions to this rule, including the "common benefit" doctrine, which permits a litigant to obtain reimbursement of attorneys' fees "in cases where the litigation has conferred a substantial benefit on the members of an ascertainable class," and where it is possible to spread the costs proportionately among the members of the class. *See Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 393–94 (1970). The plaintiff bears the burden of demonstrating a substantial benefit has been conferred. *See, e.g.*, *Kaplan v. Rand*, 192 F.3d 60, 72 (2d Cir. 1999) (concluding that fees were unwarranted when the plaintiffs had failed to establish a substantial benefit). Fees may be awarded even when there is no judgment on the merits or when the dispute has become moot because the relief sought is otherwise obtained. *Koppel v. Wien*, 743 F.2d 129, 135 (2d Cir. 1984). In such cases, the "defendant bears the burden of proof to establish the absence of a causal connection between the lawsuit and the defendant's action." *Savoie v. Merchants Bank*, 84 F.3d 52, 57 (2d Cir. 1996). Although other circuits have also required a showing that the complaint had sufficient merit to survive a motion to dismiss, the Second Circuit has declined to impose this additional requirement. *Id.*

In the instant litigation, there is no dispute that it is possible to spread the costs proportionately among the members of the class: the class of persons benefitted (SemGroup shareholders) is identifiable, benefits were conferred upon the class, and the costs of the litigation could be shifted to those benefitting. The parties dispute, however, (1) whether Defendants have established the absence of a causal

6

connection between Plaintiffs' lawsuits and the Supplemental Disclosures, and (2) whether Plaintiffs have established that the Supplemental Disclosures provided a substantial benefit to SemGroup's shareholders. For the reasons provided below, the Court concludes that Plaintiffs' lawsuits caused Defendant to issue the Supplemental Disclosures, but the Supplemental Disclosures did not confer a substantial benefit on SemGroup's shareholders. Accordingly, the motion for attorneys' fees is denied.

### I. Causation

Defendants contend that Plaintiffs' lawsuits could not have caused SemGroup to issue the Supplemental Disclosures because they were filed after several other complaints "raising the exact same purported disclosure issues" were filed in other courts. Def. Mem. at 5–6. In making this argument, Defendants cite to this Court's decision in *In re Auction Houses Antitrust Litigation*, in which Judge Kaplan remarked that subsequently filed class action complaints alleging identical claims rarely make significant contributions to litigation, and instead merely constitute "piling on" in the hope of obtaining attorneys' fees. *Id*. at 6 (citing *In re Auction Houses*, No. 00-CV-648 (LAK), 2001 U.S. Dist. LEXIS 1989, 2001 WL 210697, at *4 (S.D.N.Y. Feb 26, 2001)).

By Defendants' own admission, this is not such a case. In the Supplemental Disclosures, after noting that that "[i]n connection with the Merger Agreement . . . seven complaints challenging the sufficiency of the disclosures made in the Proxy Statement/Prospectus . . . have been filed on behalf of SemGroup stockholders," Defendants aver that they filed the Supplemental Disclosures in order "to avoid the risk of the Stockholder Actions delaying the Merger and to minimize the expense of defending the Stockholder Actions." Dkt 14 Ex. 8 at 3. Defendants do not identify any one lawsuit as the cause of their Supplemental Disclosures; instead, they seem to acknowledge that all seven lawsuits together prompted the filing of the Supplemental Disclosures.

For this reason, Defendants have failed to carry their burden of establishing the absence of a causal connection between Plaintiffs' lawsuits and the Supplemental Disclosures.

## II. Substantial Benefit

Defendants next argue that Plaintiffs are not entitled to attorneys' fees because the Supplemental Disclosures did not confer a substantial benefit on SemGroup's shareholders. Def. Mem. at 7. For the reasons provided below, the Court agrees.

Not all corporate disclosures are per se substantially beneficial to shareholders. *See Cohen v. LyondellBasell Indus. N.V.*, No. 19-CV-2622 (EK)(SMG), 2020 U.S. Dist. LEXIS 181343, 2020 WL 5810118, at *4 (E.D.N.Y. Sept. 30, 2020) (rejecting the plaintiff's contention that "the correction of any and every omission from a proxy statement constitutes, by definition, a 'substantial benefit'"). To constitute a substantial benefit, and thus to entitle a party to attorneys' fees, a disclosure must provide "something more than technical in its consequence and . . . accomplish[] a result which corrects or prevents an abuse which would be prejudicial to the rights and interests of the corporation or affect the enjoyment or protection of an essential right to the stockholder's interest." *Mills*, 396 U.S. at 396. "Illusory" or "cosmetic" disclosures do not provide substantial benefit. *See Kaplan v. Rand*, 192 F.3d 60, 71–72 (2d Cir. 1999).

In cases such as this, where the alleged benefit is not directly pecuniary in nature, the substantiality of a benefit can be difficult to discern. Plaintiffs assert that they substantially benefitted shareholders by providing them the ability "to fully assess the fairness of the [Merger] and cast an informed vote." Pl. Mem. at 2. As Plaintiffs correctly note, courts have held in numerous cases that the promotion of informed corporate suffrage may qualify as a substantial shareholder benefit. *See Mills*, 396 U.S. at 396; *Amalgamated Clothing & Textile Workers Union v. Wal-Mart Stores*, 54 F.3d 69, 71–72 (2d Cir. 1995); *Koppel*, 743 F.2d at 134; *Kopet v. Esquire Realty Co.*, 523 F.2d 1005, 1008 (2d Cir. 1975). Yet it cannot be said that providing shareholders with *any* information per se bolsters "informed corporate suffrage." If this were the case, then any lawyer who brought about the publication of additional information would be entitled to attorneys' fees, a proposition the Supreme Court has

8

unequivocally rejected. *See Mills*, 396 U.S. at 396; *see also Schechtman v. Wolfson*, 244 F.2d 537, 540 (2d Cir. 1957) ("But there should be some check on derivative actions lest they be purely strike suits of great nuisance and no affirmative good, and hence it is ruled generally that the benefit to the corporation and the general body of shareholders must be substantial."). Indeed, in each of the cases Plaintiffs cite to support their claim of informed corporate suffrage, the disclosures prompted by the plaintiffs' lawsuits were critical to the shareholders' ability to have an informed vote. In *Kopet*, for example, prior to the plaintiff's lawsuit, the defendants had completely neglected to file a registration statement. 523 F.2d at 1006. In *Mills*, the plaintiff's lawsuit revealed that all eleven members of the defendant's board of directors had a significant conflict of interest: they had been nominated by and were "under the control and domination of" the acquiring company. 396 U.S. at 378 (internal quotation marks omitted). And in *Amalgamated*, only after the plaintiffs filed suit did the defendant disclose a shareholder proposal regarding affirmative action policies that previously had been omitted from the proxy statement. 54 F.3d at 70. In sum, this oft-cited case law supports the proposition that disclosure of information important—if not necessary—for an informed corporate vote provides shareholders a substantial benefit.

Here, by contrast, Plaintiffs have failed to show that any of the information disclosed meets this standard. The record indicates that the Merger vote was already an informed one; the Supplemental Disclosures merely provided shareholders with additional details about information they already had. Accordingly, these disclosures did not substantially benefit SemGroup's shareholders.

The Court will address each of the Supplemental Disclosures in turn.

### A. Financial Projections for SemGroup and ET

Because Plaintiffs' lawsuits prompted the disclosure of SemGroup's 2023 and 2024 cash flow projections and ET's 2019 through 2022 cash flow projections, Plaintiffs facilitated the distribution of additional information to shareholders. Plaintiffs, however, provide no support for the contention that

9

this additional information affected the shareholders' ability to accurately assess the fairness of the Merger.

Plaintiffs assert that cash flow projections are "fundamentally the most important metric shareholders use to assess the adequacy of the consideration in a merger" and note that courts have found that " it smacks of materiality that a voter be made aware of the Company's cash flow projections in order to make an informed decision." Pl. Mem. at 11 (citing *Nichting v. DPL Inc.*, 2011 U.S. Dist. LEXIS 76739, 2011 WL 2892945, at *4 n.16 (S.D. Oh. July 15, 2011)). Cash flow projections are surely an important factor to consider in assessing the fairness of a merger offer. But here, where Defendants disclosed four years of cash flow projections in the Proxy Statement, the Court cannot conclude that Defendants deprived shareholders of this information. Indeed, in many of the cases on which Plaintiffs rely, the defendants did not provide their shareholders with *any* cash flow projections. *See*, *e.g.*, *Karp v. First Conn. Bancorp, Inc.*, 2019 U.S. Dist. LEXIS 162819, 2019 WL 4643799, at *4 (D. Md. Sept. 24, 2019); *Maric Capital Master Fund, Ltd. v. Plato Learning Inc.*, 11 A.3d 1175, 1178 (Del. Ch. 2010); *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 202–03 (Del. Ch. 2007). This fact alone renders these cases meaningfully distinguishable from the instant litigation.

The Court further finds that Plaintiffs have not met their burden of establishing that providing shareholders with cash flow projections for ET meaningfully altered the shareholders' ability to accurately assess the fairness of a merger. Pl. Mem. at 12. To be sure, information about the current financial status of the acquiring firm may be relevant in a merger such as this one, where the shareholders of the target company are being paid in part with shares of the acquiring company. *See Republic Tech. Fund, Inc. v. Lionel Corp.*, 483 F.2d 540, 544, 547 (2d Cir. 1973) (finding acquiring company disclosures misleading because they misrepresented the current financial status of the business). But as Defendants note, once the Merger was effectuated, SemGroup's shareholders were under no obligation to retain their shares in ET, and could have immediately sold those shares for cash. And if they decided to retain their

shares, they—like the remainder of ET's shareholders—would not be entitled to disclosure of internal projections. *See In re Facebook, Inc.*, 986 F. Supp. 2d 487, 507 (S.D.N.Y. 2013) ("Internal forecasts are generally considered 'not material facts that are require[d] to be disclosed' in a registration statement."); *see also Fecht v. Northern Telecom Ltd. (In re N. Telecom Ltd. Secs. Litig.)*, 116 F. Supp. 2d 446, 458 (S.D.N.Y. 2000) ("The federal securities laws do not obligate companies to disclose their internal forecasts."). Therefore, the only information about ET's financial health to which the shareholders were necessarily entitled was information about the current financial health of the company. Plaintiff has thus not persuaded the Court that these projections of future financial status would be necessary to fairly assess a merger offer.

Moreover, although Plaintiffs note that other courts have granted fees in cases prompting disclosure of financial projections, Pl. Mem. at 12, each of the cases cited is materially different from the instant one. In *Uzun v. Arris International Inc.*, for instance, the court granted attorneys' fees upon the consent of the defendants via a settlement agreement; it made no independent finding that attorneys' fees were warranted as a matter of law. *See* Monteverde Decl. ¶ 9 & Ex. D (Order and Final Judgment from *Uzun v. Arris Int. Inc.*, Case No. 18-CV-05555-WMR (N.D. Ga. May 27, 2020)). In *Plato Learning*, unlike here, the defendant entirely omitted cash flow estimates in its proxy statement. *See* 11 A.3d at 1178. The same is true for *Chen v. Select Income REIT*. *See* No. 18-CV-10418 (GBD) (KNF), 2019 U.S. Dist. LEXIS 177687, 2019 WL 6139014, at *1 (S.D.N.Y. Oct. 11, 2019). And the court's decision in *Hamil v. Ambry Genetics Corporation*, is too perfunctory to allow for comparison. *See generally* 2019 Del. Ch. LEXIS 584, 2019 WL 160275 (Del. Ch. Jan. 9, 2019).

In sum, Plaintiffs have failed to bear their burden of establishing that the financial projections for SemGroup and ET included in the Supplemental Disclosures imparted a substantial benefit on shareholders.

### B. Inputs and assumptions in Jefferies' Valuation Analyses

Plaintiffs next assert that by providing shareholders the assumptions and valuation metrics underlying Jefferies' analyses, the Supplemental Disclosures enabled shareholders "to assess the merits [and] weight to be applied [to] these analyses," thus providing them a substantial benefit. Pl. Mem. at 13. Yet "[i]nvestors, as a general matter, are *not* entitled to 'disclosures sufficient to make [their] own independent assessment of a stock's value.'" *Sodhi v. Gentium S.P.A.*, No. 14-CV-287 (JPO), 2015 U.S. Dist. LEXIS 7344, 2015 WL 273724, at *5 (S.D.N.Y. Jan. 22, 2015) (emphasis in original). Instead, "a disclosure statement must contain only a 'fair summary' of the underlying bases for a financial advisor's fairness opinion." *Id*. Numerous courts, including this one, have held that assumptions and valuation metrics like those disclosed here are immaterial as a matter of law, and that their disclosure is thus not required by law. *See id.* at *6 (holding that "the inputs and assumptions employed by [a financial advisor] to derive the range of discount rates . . .used in its" analysis "need not be disclosed" and that the omission of revenue multiples is "insufficient to allege a violation of Section 14(e)"); *see also Bushansky v. Remy Int'l, Inc.*, 262 F. Supp. 3d 742, 751 (S.D. In. 2017) ("[T]he disclosure of individual multiples for each of the nineteen companies UBS Securities compared to Remy, as well as figures underlying six merger transactions examined by UBS Securities, is immaterial."); *In re Trulia Stockholder Litig.*, 129 A.3d 884, 906 (Del. Ch. 2016) (holding that inclusion of "individual company multiples are [not] material"); *Dent v. Ramtron Int'l Corp.*, 2014 Del. Ch. LEXIS 110, 2014 WL 2931180, at *14 (Del. Ch. June 30, 2014) ("[T]he exact details of how and why a financial advisor chooses certain discount rates or multiple ranges when conducting a DCF analysis goes well beyond the 'fair summary' that is required under our law."). Indeed, the judge in the only case Plaintiffs cite to support their argument to the contrary did not impose an obligation to disclose market multiples, he merely stated in dicta that doing so was "a matter of best practices." *In re Celera Corp. S'holder Litig*., 2012 Del. Ch. LEXIS 66, 2012 WL 1020471, at *32 (Del. Ch. Mar. 23, 2012), *aff'd in part & rev'd in*

*part*, 59 A.3d 418 (Del. 2012).  And while Plaintiffs correctly note that the District Court for Northern District of Ohio recently granted attorneys' fees in an action concerning the supplemental disclosure of inputs and assumptions, Pl. Mem. at 13, the fee award in that case was agreed to by both parties in a settlement agreement, unlike here, *see* Monteverde Decl. ¶ 9 & Ex. G (Order and Final Judgment from *Solak v. Consolino*, No. 5:16-CV-02470-SL (N.D. Oh. May 31, 2017)).

Plaintiffs have thus failed to bear their burden of establishing that assumptions and valuation metrics included in the Supplemental Disclosures provided shareholders a substantial benefit.

### C. Conflicts of Interest & Outreach to Potential Counterparties

Plaintiffs do not assert that the disclosure of further information about ET's de minimis conflict of interest substantially benefitted shareholders.  *See* Pl. Mem. at 13–14.  They do, however, maintain that Defendants erred in not providing this information sooner because directors have a duty "to provide the stockholders with an accurate, full, and fair characterization of" the history leading up to the Merger and "to avoid misleading partial disclosures." *Id*. at 14 (quoting *Arnold v. Soc'y for Sav. Bancorp*, 650 A.2d 1270, 1280 (Del. 1994) and *Zirn v. VLI Corp.*, 681 A.2d 1050, 1056 (Del. 1996)).  Yet Plaintiffs fail to show how the Proxy Statement's handling of the conflict of interest rose to the level of a "misleading partial disclosure."  Indeed, the conflict here has been consistently characterized as "de minimis."  Dkt. 14 Ex. 1 (Proxy Statement) at 18; *id*. Ex. 8 (Supplemental Disclosures) at 4.  Accordingly, for purposes of this Merger, it did not constitute material information.  *See Allyn Corp. v. Hartford Nat'l Corp.*, 1982 U.S. Dist. LEXIS 17722, at *67 (D. Conn. Mar. 30, 1982) (holding that a "de minimis" error in a proxy statement is "not in any sense 'material'"); *see also Newman v. Univ. of Dayton*, 2017 U.S. Dist. LEXIS 179868, 2017 WL 4919225, at *7 (N.D. Oh. Oct. 31 2017) (holding in the bankruptcy context that failure to disclose "de minimis" earnings was not material); *Smith v. Dynamic Recovery Sols. LLC*, 2019 U.S. Dist. LEXIS 93879, 2019 WL 2368460, at *6 (D.S.C. June 5, 2019)

(holding in the context of the Fair Debt Collection Practice Act that a misstatement was "de minimis and therefore not material").

Finally, Plaintiffs have failed to articulate a reason why the Supplemental Disclosures' discussion of the outreach to potential counterparties actually provided additional information to shareholders, much less information that substantially benefitted them. *Compare* Dkt. 14 Ex. 1 (Proxy Statement) at 15 (detailing that "[t]he SemGroup board of directors . . . discussed the appropriate framework for evaluating potential offers from different counterparties, including strategic buyers and private equity firms, as well as the potential value achievable from entering into [a] proposed joint venture transaction with" another company) *with id*. Ex. 8 (Supplemental Disclosures) at 4 (stating that SemGroup "instructed representatives of Jefferies to proceed with a formal market check process, including outreach to potential counterparties, in order to seek additional indications of value for SemGroup in response to [ET's] increased, revised unsolicited proposal").

Plaintiffs have thus failed to bear their burden of establishing that the disclosure of ET and Jefferies' de minimis conflict of interest or SemGroup's outreach to potential counterparties provided a substantial benefit to shareholders.

\*   \*   \*

In sum, while the Supplemental Disclosures provided SemGroup's shareholders with some additional information, Plaintiffs have not shown that this additional information made any meaningful difference in their ability to make an informed decision on the Merger. The Supplemental Disclosures thus did not provide a substantial benefit to the shareholders. For this reason, Plaintiffs are not entitled to attorneys' fees.

### III.   State Law Claims

In the alternative, Plaintiffs assert that because "SemGroup is incorporated in Delaware, Plaintiffs' Counsel . . . are entitled to an award of attorneys' fees and expenses under Delaware law for

conferring the substantial benefit on SemGroup shareholders." Pl. Mem. at 23. Plaintiffs seemingly abandon this claim in their reply brief. *See State St. Banking Trust Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 172 (2d Cir. 2004) ("[W]hen a party fails adequately to present arguments in [its] brief, we consider those arguments abandoned."). In any event, it fails as a matter of law. Because Plaintiffs did not assert state-law causes of action in the complaint, only federal securities law violations, "no basis exists for applying state law to determine the attorneys' fees application." *Chen*, 2019 WL 6139014, at *12. Therefore, Plaintiffs' claim for state law attorneys' fees is denied.

## CONCLUSION

For the reasons stated above, the motion for attorneys' fees is DENIED. The Clerk of Court is respectfully directed to terminate the motions pending at docket entry 6 in case number 19-CV-9630 and docket entry 13 in case number 19-CV-10412, and to close both of those cases.

SO ORDERED.

Dated:   March 29, 2021
         New York, New York

                                                    _____
                                                    RONNIE ABRAMS
                                                    United States District Judge